**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1131

RENAISSANCE GREETING CARDS, INCORPORATED,

Plaintiff - Appellant,

versus

DOLLAR TREE STORES, INCORPORATED,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T. S. Ellis, III, District Judge.  (1:05-cv-00341-TSE)

Argued:  November 30, 2006        Decided:  March 30, 2007

Before WIDENER and WILKINSON, Circuit Judges, and David A. FABER, Chief United States District Judge for the Southern District of West Virginia, sitting by designation.

Affirmed by unpublished opinion.  Judge Faber wrote the opinion, in which Judge Widener and Judge Wilkinson joined.

**ARGUED:** Michael Steven Culver, MILLEN, WHITE, ZELANO & BRANIGAN, P.C., Arlington, Virginia, for Appellant.  Beth Hirsch Berman, WILLIAMS, MULLEN, HOFHEIMER & NUSBAUM, P.C., Norfolk, Virginia, for Appellee.  **ON BRIEF:** Adam Casagrande, WILLIAMS, MULLEN, HOFHEIMER & NUSBAUM, P.C., Norfolk, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

FABER, Chief District Judge:

Renaissance Greeting Cards, Inc., appeals the district court's grant of summary judgment to Dollar Tree Stores, Inc., and the court's determination of an evidentiary issue under Federal Rule of Evidence 408. For the following reasons, we affirm with regard to both issues.

I.

In connection with its greeting cards business, appellant Renaissance Greeting Cards, Inc. ("RGC"), owns three registered trademarks containing the words "Renaissance" and "Renaissance Greeting Cards." Although the marks were registered in 1992, 1996, and 2003, respectively, at least one of these marks has been in continuous use by RGC or its predecessors since 1977. The parties do not dispute that RGC's "Renaissance" mark is incontestible pursuant to 15 U.S.C. §§ 1065 and 1115(b).

Although RGC operates one retail outlet store in Maine, the vast majority of RGC's sales are made on a wholesale basis to assorted retailers and to florists affiliated with RGC's parent company, Florists' Transworld Delivery, Inc. ("FTD"). Not surprisingly, RGC's advertising expenditures, which have averaged $358,000.00 in recent years, are targeted mostly at these wholesale customers. With recent annual sales averaging twelve million dollars, RGC claims approximately 0.2% of the greeting cards

2

market.  Although RGC's products at one time included a line of gift bags, gift wrap, bows, and ribbon, RGC abandoned this line in 1990, and has since confined itself to the sale of greeting cards.

Appellee Dollar Tree Stores, Inc. ("DTS"), owns and operates approximately 2,800 discount retail stores nationwide, with recent annual sales totaling in excess of $3 billion.  Since 1993, DTS has sold a line of gift bags bearing a "Renaissance" or "Renaissance Gift Bags" mark.  In 2002, it expanded this line to include gift wrap, boxes, bows, ribbon, and tissue paper.  DTS estimates that it has sold somewhere between 250 million and 500 million units of these products since 1995.  DTS also sells a line of greeting cards, but these cards, which are produced by American Greetings Corporation, are sold under the trademark "Tender Thoughts."

At the time it selected its "Renaissance" marks, DTS was unaware of RGC's trademarks.  Indeed, DTS did not conduct a trademark search or consult counsel with regard to its use of the mark until 2003, when it discovered that the "Renaissance" mark was widely used by many companies.  As a result of this discovery, DTS eventually began marketing its line of gift products under the mark "Voila."  The older "Renaissance" gift bags, however, remained available for purchase in some of DTS's stores as late as July 2005.

When RGC discovered DTS's use of the mark in 2003, it sent a letter to Betta Products, Inc., the company it believed to have

3

produced the bags. Betta Products directed RGC to DTS, and in December 2003, counsel for RGC sent a letter to DTS seeking to discuss the issue. When this and two subsequent letters produced no response, RGC filed suit on March 29, 2005, alleging (I) infringement of a federally registered trademark under 15 U.S.C. § 1114(1); (ii) trademark infringement and a false designation of origin under 15 U.S.C. § 1125(a); and (iii) common law infringement and unfair competition under Virginia state law. On December 19, 2005, the district court granted summary judgment in favor of DTS, the parties having previously agreed to a bench trial.

RGC filed a timely notice of appeal with regard to two issues: (1) the district court's determination that no likelihood of confusion existed between RGC's and DTS's marks; and (2) the district court's decision to strike portions of the complaint and to preclude certain discovery pursuant to Federal Rule of Evidence 408. We have jurisdiction pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1291.

II.

We review *de novo* the legal determinations made by a district court in granting summary judgment. See Lone Star Steakhouse & Saloon v. Alpha of Va., Inc., 43 F.3d 922, 928 (4th Cir. 1995). A district court's likelihood of confusion inquiry, however, necessarily involves factual determinations. Int'l Bancorp, LLC v.

4

Societe Des Bains De Mer Et Du Cercle Des Etrangers a Monaco, 329 F.3d 359, 362 (4th Cir. 2003). Where, as here, the court is to be the ultimate finder of fact, the entire record is before the court at the summary judgment stage,[1] and only the inferences to be drawn from the underlying facts – as opposed to the facts, themselves – are in dispute, a court may properly proceed to final judgment. See id.

> It makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts. If a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should draw his inferences without resort to the expense of trial.

Id. at 362 (quoting Matter of Placid Oil Co., 932 F.2d 394, 398 (5th Cir. 1991)(internal quotations and citations omitted)). In such circumstances, we review the district court's findings for clear error. Int'l Bancorp, 329 F.3d at 362; see also Petro Stopping Centers, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 91-92 (4th Cir. 1997)("This circuit reviews district court determinations regarding likelihood of confusion under a clearly erroneous standard."). Under this standard, the district court's findings may not be disturbed unless there is no evidence in the

---

[1]"The Court: 'All right. I don't need anything more. After that, the case is ready for disposition, isn't it, Mr. Hanes [Attorney for Dollar Tree], Mr. Culver [Attorney for RGC].' Attorney for Dollar Tree: 'Yes.' Attorney for RGC: 'Yes.'" (J.A. at 355.)

record to support them, or when, having reviewed the record ourselves, "we are left with a definite and firm conviction that a mistake has been committed." Petro Stopping, 130 F.3d at 92. In no case, however, will this standard permit a district court's decision to stand where the court incorrectly applied the law. Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526 (4th Cir. 1984).

A.

Actions for trademark infringement require proof of two elements: (1) that the plaintiff has a valid mark, and (2) that the similarity of the defendant's mark to the plaintiff's creates a "likelihood of confusion" in the marketplace. See Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990); 15 U.S.C. § 1114(1). Because the parties do not dispute that RGC's "Renaissance" mark is incontestible pursuant to 15 U.S.C. §§ 1065 and 1115(b), the district court properly limited its inquiry to the "likelihood of confusion" element.[2]

Courts consider seven factors in evaluating whether a competing mark creates a likelihood of confusion:

1) The strength or distinctiveness of the mark;
2) The similarity of the two marks;

---

[2]Because the "likelihood of confusion" test governs not only suits under the Lanham Act, but also Virginia common law actions for infringement and unfair competition, we analyze appellant's causes of action simultaneously. Lamparello v. Falwell, 420 F.3d 309, 312 n.1 (4th Cir. 2005).

3)  The similarity of the goods or services the marks identify;
4)  The similarity of the facilities the two parties use in their businesses;
5)  The similarity of the advertising used by the two parties;
6)  The defendant's intent;
7)  Actual confusion.

Pizzeria Uno, 747 F.2d at 1527. These factors will not be of equal relevance in every case. Lone Star, 43 F.3d at 933. Indeed, "[c]ertain factors may not be germane to every situation," and certain factors other than those listed above may be relevant to the "likelihood of confusion" analysis in certain cases. Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 463 (4th Cir. 1996). RGC contends that the district court misapplied these factors in certain respects to such an extent that it committed legal error. We will consider each element in turn.

1.

RGC contends that the district court improperly weighed the strength of the "Renaissance" mark, and that it placed too much emphasis on the "strength of the mark" element in analyzing the likelihood of confusion. The district court began its evaluation of the mark's strength by noting our statement in Pizzeria Uno that the "first and paramount factor under this set of factors is the distinctiveness or strength of the two marks." Pizzeria Uno, 747 F.2d at 1527. It then proceeded to apply the two-factor test set forth in CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263 (4th Cir. 2006). Under that test, the court considers (1) the

7

conceptual strength of the mark, and (2) the commercial strength of the mark. Id. at 269.

A mark's conceptual strength is determined in part by its placement into one of four categories of distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. Pizzeria Uno, 747 F.2d at 1527. Suggestive and arbitrary marks are deemed strong and presumptively valid, whereas generic and descriptive marks are deemed weak, and require proof of secondary meaning within the market in order to receive trademark protection. Id. After considerable analysis, the district court concluded that RGC's "Renaissance" mark is suggestive, because it "does not describe any particular characteristic of RGC's greeting cards, but "requires some imagination to connect it with the goods.'" (J.A. at 353 (quoting Retail Servs., Inc. v. Freebies Publ'g, 364 F.3d 535, 539 (4th Cir. 2004).)

This categorization does not end a court's evaluation of a mark's conceptual strength, however. A court must also consider other registrations of the mark, because "the strength of a commonly-used mark decreases as the number of third-party registrations increases. Pizzeria Uno, 747 F.2d at 1531. The district court therefore considered evidence of 465 federal and 203 state trademark registrations or pending applications, all for marks using the word "Renaissance." (J.A. at 358.) It then specifically considered evidence that twenty-three of these

8

registrations, including RGC's, are for marks that fall in the same class of paper products as RGC's, PTO International Class 16.[3] (Id. at 358, 344.)  As a result, the court concluded that this widespread usage of the word "Renaissance" in other trademarks significantly diminished any distinctiveness inherent in RGC's marks.

Citing CareFirst, RGC asserts that the district court erred in considering evidence that "Renaissance" is used in products outside RGC's class of paper goods.  CareFirst does not support such an argument.  In that case, we explained that "the frequency of prior use of [a mark's text] in other marks, particularly in the same field of merchandise or service,' illustrates the mark's lack of conceptual strength." CareFirst, 434 F.3d at 270 (quoting Pizzeria Uno, 747 F.2d at 1530-31).  Because in that case there was ample use of "CareFirst" and similar marks in the health care industry alone, it was unnecessary to consider use of the mark in unrelated

---

[3]Under the regulations of the Patent and Trademark Office, Class 16 includes the following:

> Paper, cardboard and goods made from these materials, not included in other classes; printed matter; bookbinding material; photographs; stationery; adhesives for stationery or household purposes; artists' materials; paint brushes; typewriters and office requisites (except furniture); instructional and teaching material (except apparatus); plastic materials for packaging (not included in other classes); playing cards; printers' type; printing blocks.

International Schedule of Classes of Goods and Services, 37 C.F.R. § 6.1(16).

industries. As the above passage makes clear, however, evidence of third-party use of a mark in unrelated markets – although not as persuasive as use within the same product class – indicates a mark's lack of conceptual strength.[4]

The second step in the "strength of the mark" analysis is to consider the mark's commercial strength, a concept similar to the "secondary meaning" inquiry considered in evaluating a mark's validity. CareFirst, 434 F.3d at 269 n.3. While third-party use of the mark is relevant at this stage, as well, the court also considers a number of other factors, such as advertising expenditures, consumer awareness of the source of the mark, market share, and unsolicited media coverage. See Perini, 915 F.2d at 125. The district court faithfully considered these and other factors, noting RGC's market share of less than one percent of the greeting cards market, its average annual advertising expenditures of less than $360,000.00, and the lack of both independent media coverage of the business and survey evidence indicating an association between RGC's mark and its product. (J.A. at 361.) Because of the ample evidence supporting the district court's decision on this point, we find no error in the court's conclusion

_____

[4]RGC further argues that the district court ought not to have discounted its attempts to police the use of its mark by third-parties. The district court's opinion makes evident that it gave due consideration to RGC's efforts in this regard, but was unimpressed with the "mixed results" RGC achieved. (J.A. at 359 n.15.)

that RGC possesses a weak mark "such that its ability to identify the source of products does not extend beyond the greeting card market." (Id. at 361-62.) See Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 394 (2d Cir. 1995).[5]

2.

The second factor to be considered in the "likelihood of confusion" analysis is the similarity of the marks in question. In order for this factor to weigh in favor of the plaintiff, the marks need not be identical; rather, they must only be "sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks." Lone Star, 43 F.3d at 936. For purposes of summary judgment, the district court assumed the marks to be similar in appearance. This factor thus weighs in favor of a finding of likelihood of confusion.

---

[5]On November 30, 2006, the day this matter was argued, this court issued its opinion in another trademark dispute, Synergistic Int'l, LLC v. Korman, 470 F.3d 162 (4th Cir. 2006). Although RGC argues that Synergistic supports its position with regard to consideration of third-party registrations of a mark in unrelated industries, we must conclude otherwise. In Synergistic, we concluded that the appellant's mark was conceptually strong based in part on the fact that the mark's dominant word, although commonly used in other industries, was not commonly used in the appellant's industry or related industries. Id. at 174. By contrast, "Renaissance" is used not only by hundreds of businesses in industries unrelated to RGC's, but also by numerous businesses within RGC's PTO class of products. Furthermore, the appellant's mark in Synergistic was found to be commercially strong. As described above, that is not the case here.

3.

Next, the court considers the similarity of the goods or services identified by the marks. With regard to this element, the products in question need not be identical or in direct competition with each other. Because confusion may arise even where products are merely "related," the court is to consider "whether the public is likely to attribute the products and services to a single source." CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 679 (4th Cir. 2001). An important function of this "related goods" concept is to protect trademark owners' ability to expand into associated markets in the future. Id. at 680-81.

After considering the manner in which greeting cards and gift products are marketed in the industry, and the fact that RGC at one time marketed its own line of gift products, the district court concluded that the parties' products constituted related goods. The court then properly observed that, although the fact that goods are related weighs in favor of a finding of infringement, the similarity of the goods, alone, is not dispositive as to the likelihood of confusion. (J.A. at 364-65 (citing Arrow Distilleries, Inc. v. Globe Brewing Co., 117 F.2d 347, 351 (4th Cir. 1941); Petro Stopping, 130 F.3d at 95; 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:62 (4th ed. 2006).)

12

4.

The fourth factor to be considered in the "likelihood of confusion" analysis is the similarity of the facilities used by the parties in their businesses. As McCarthy explains, the court is to consider the class of consumers purchasing the products, and the context in which they make their purchases. McCarthy, supra, § 24:51. Although noting that DTS's products were most likely to be purchased by "value-conscious consumers," the district court concluded that the placement of the products within the stores and their general retail availability were sufficient to tilt this factor "very modestly" in favor of a finding of infringement. (J.A. at 365-66.) We see no error in this determination.

5.

We next consider the similarity of the advertising employed by the parties. It is undisputed that DTS does not advertise its greeting cards line in any way. Moreover, although RGC does engage in some limited advertising, its efforts are targeted almost entirely at its wholesale customer base. RGC contends that the district court erred in interpreting this factor as militating against infringement, rather than assigning it neutral effect. (Brief of Appellant at 54 (citing Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307, 1314 (11th Cir. 1999).) The district court's holding on this point was supported by sound authority, however, and we find no error. See IDV N. Am., Inc. v.

13

S&M Brands, Inc., 26 F. Supp. 2d 815, 828-29 (E.D. Va. 1998)(citing Pizzeria Uno, 747 F.2d at 1527; Petro Stopping, 130 F.3d at 95).

6.

The sixth factor to be considered is the defendant's intent in adopting its mark.[6]  As we explained in Pizzeria Uno, "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion."  Pizzeria Uno, 747 F.2d at 1535.

RGC contends that DTS exhibited bad faith by failing to conduct a trademark search or to obtain advice of counsel before adopting the "Renaissance" mark for use on its gift products, and by continuing to use the mark after being contacted by RGC.  RGC's first argument necessarily fails, because, as the district court reasoned, "[a]t most, the failure to conduct a search is probative of Dollar Tree's carelessness, which even if true, has little bearing on the likelihood that its allegedly infringing mark will confuse the public."  (J.A. at 367 (citing McCarthy, supra, § 23:109).)  Moreover, DTS was justified in continuing its use of the "Renaissance" mark if, as the district court concluded, DTS

[6]To the extent appellant argues that the district court's decision to strike portions of the complaint and to preclude certain discovery are relevant to this factor, the court notes that the district court's ruling on those points is affirmed in Section III below.

14

believed RGC's mark to be too weak to prevent DTS's use of the mark on its gift products. See McCarthy, supra, § 23:120. Accordingly, the district court committed no error in concluding that the intent factor militated against a finding of infringement.

7.

Finally, the "likelihood of confusion" analysis requires consideration of instances of actual confusion among consumers. RGC produced evidence of four instances of confusion, one involving a shop owner, two involving shop managers, and one involving an independent sales representative. The district court found that this small number of cases, none of which demonstrated confusion among the actual consumer public, weighed against RGC's position, rather than in favor. In so holding, the district court took into account the large volume of sales from which RGC's instances of confusion were taken, as well as RGC's unsuccessful efforts to uncover additional examples of actual confusion.

The court also appropriately considered our statement in Petro Stopping that, "[a]t worst, [a] company's failure to uncover more than a few instances of actual confusion creates a 'presumption against likelihood of confusion in the future.'" Petro Stopping, 130 F.3d at 95 (quoting Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263 (5th Cir. 1980)). In Petro Stopping, we determined that the appellant's evidence of actual confusion, consisting of only a few instances out of more than $2 billion in sales, was "at

15

best *de minimis*." Petro Stopping, 130 F.3d at 95. We see no error in the district court reaching the same conclusion in the instant case.

### B.

Having determined that the district court committed no clear error in assessing each of the Pizzeria Uno factors, we turn to RGC's contention that the court erred in weighing these factors against each other. Specifically, appellant argues that the court placed excessive significance on the strength of the mark. This argument is similarly unavailing. As previously noted, these factors will be of varying relevance in every case. Lone Star, 43 F.3d at 933. Nonetheless, where only three of the seven Pizzeria Uno factors weighed in favor of a finding of likelihood of confusion, we are unable to conclude that the district court committed clear error in finding no infringement. Ample evidence supported the court's decision, and we will not disturb it.

### III.

The second issue RGC raises on appeal is the district court's exclusion, pursuant to Federal Rule of Evidence 408, of evidence relating the parties' settlement negotiations.[7] Specifically, the

---

[7]After a review of the record, we believe RGC made clear to the district court that it wished to introduce the disputed evidence to show DTS's intent for purposes of the "likelihood of

district court ordered such content stricken from two paragraphs of RGC's original complaint, and subsequently upheld a protective order entered by the magistrate judge precluding witness testimony on the issue. We review both decisions for an abuse of discretion. See Seay v. TVA, 339 F.3d 454, 480 (6th Cir. 2003)("We review the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned."); Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1070 (9th Cir. 2002)(reviewing ruling on motion to strike under Fed. R. Civ. P. 12(f) for abuse of discretion); Stanbury Law Firm, P.A. v. IRS, 221 F.3d 1059, 1063 (8th Cir. 2000)(same); M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1992)(protective order entered under Fed. R. Civ. P. 26(c) reviewable for abuse of discretion).

Paragraphs 16 and 17 of RGC's original complaint detailed certain communications between the parties' attorneys made during settlement negotiations. (J.A. at 14.) In its answer to the complaint, DTS moved to strike these paragraphs pursuant to Federal Rule of Evidence 408, which provides as follows:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or

confusion" analysis. We are thus unpersuaded by DTS's argument that RGC waived this issue below. (See Brief of Appellee at 32-34.)

17

attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. RGC contended that the passages, which included statements by counsel for DTS as to how many units of the "Renaissance" gift products remained in stock, were admissible as an exception to Rule 408 to show bad faith or willfulness.

The court took up the issue at a motions hearing on June 3, 2005, discussing the matter at length. The transcript of that hearing makes evident that the court was aware of the law governing motions to strike under Rule 12(f), and that such motions are to be granted infrequently. (J.A. at 92.) See Stanbury, 221 F.3d at 1063. It is equally clear that the court felt RGC's proffered exceptions to Rule 408 were impermissible under the rule, and that it did not consider the disputed information to be probative. As a result, the district court granted the motion to strike in part and directed RGC to file an amended complaint. In doing so, however, the court narrowly tailored the portions of Paragraphs 16 and 17 to be excluded, and assured counsel for RGC that it would

18

reconsider the matter if an exception to Rule 408 were later revealed.

RGC made its argument on the basis of rather weak authority. It was able to cite no cases from this circuit in support of its position. Furthermore, one of its chief cases, Itron, Inc. v. Benghiat, No. 99-501, 2003 U.S. Dist. LEXIS 15039 (D. Minn. Aug. 29, 2003), is an unpublished district court opinion from the District of Minnesota, and is therefore of questionable precedential value. Another case on which it relies actually militates against admission of the disputed paragraphs. Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc., 823 F. Supp. 1077 (S.D.N.Y. 1993). In Stern's, the court considered statements made during settlement negotiations for purposes of showing the defendant's intent. The Stern's court only considered statements made by the plaintiff, however, and only to the extent they proved notice of the plaintiff's objection to the defendant's mark. Id. at 1088 n.6 (adding that statements made during settlement negotiations are clearly inadmissible under Rule 408 where they may be considered admissions as to the merits of the action). Similarly, the district court here informed RGC that it would consider statements made by RGC to DTS. (J.A. at 94-96.) Because the district court's ruling on this point was reasonable and not overreaching, we find no abuse of discretion.

19

The protective order arose from a notice of deposition issued by RGC that included a demand for the production of a witness to testify to "all factual representations made to plaintiff's counsel during negotiations with defendant's counsel in 2004 involving the mark RENAISSANCE . . . ." (J.A. at 189.) Upon motion by DTS, the magistrate judge to whom the motion was referred concluded that, although evidence of settlement negotiations may be discoverable under some circumstances, RGC had not shown why the settlement negotiations were relevant to its "claims or defenses." (J.A. at 184.) Moreover, the magistrate judge observed that RGC did not say what fact it wished to discover through inquiry about the negotiations. (Id.) When RGC objected to the magistrate judge's order, the district court considered the issue at a subsequent motions hearing. Concluding, as it had at the prior hearing on DTS's motion to strike, that the disputed information was not probative and did not meet an exception to Rule 408, the district court overruled RGC's objections to the order. The district court's decision in this regard was supported by sound policy considerations. See Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652, 654 (4th Cir. 1988)("The public policy of favoring and encouraging settlement makes necessary the inadmissibility of settlement negotiations in order to foster frank discussions."). Accordingly, we find no abuse of discretion.

20

IV.

For the foregoing reasons, we affirm the district court's rulings with regard to Federal Rule of Evidence 408, and its grant of summary judgment to Dollar Tree Stores.

AFFIRMED